*Phillips v. Collin Cnty. Cmty. Coll. Dist., et al.*

# Exhibit D:
# Matkin Deposition

```
 1              THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       SHERMAN DIVISION

 3   JOSEPH MICHAEL PHILLIPS,      )
                                   )
 4              Plaintiff,         )
                                   )
 5   VS.                           ) Civil Action
                                   ) No. 4:22-cv-184-ALM
 6   COLLIN COUNTY COMMUNITY       )
     COLLEGE DISTRICT, et al.,     )
 7                                 )
                Defendants.        )
 8

 9          ------------------------------------

10      ORAL AND VIDEOTAPED REALTIME DEPOSITION OF

11                  H. NEIL MATKIN

12                 FEBRUARY 8, 2023

13          ------------------------------------

14

15

16       ORAL AND VIDEOTAPED REALTIME DEPOSITION OF H. NEIL

17   MATKIN, produced as a witness at the instance of the

18   Plaintiff, and duly sworn, was taken in the above-styled

19   and numbered cause on February 8, 2023, from 9:41 a.m.

20   to 6:21 p.m., before Christy Cortopassi, CSR in and for

21   the State of Texas, reported by machine shorthand, at

22   the law offices of Abernathy Roeder Boyd Hullett, 1700

23   N. Redbud Boulevard, Suite 300, McKinney, Texas 75069,

24   pursuant to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.
```



```
 1                  A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         Mr. Greg H. Greubel
           Mr. Joshua T. Bleisch
 5         FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
           510 Walnut Street
 6         Suite 1250
           Philadelphia, Pennsylvania 19106
 7         215.717.3473
           greg.greubel@thefire.org
 8         josh.bleisch@thefire.org

 9

10    FOR THE DEFENDANT COLLIN COUNTY COMMUNITY COLLEGE
      DISTRICT:

11         Mr. Charles Joseph Crawford
           ABERNATHY ROEDER BOYD & HULLETT, PC
12         1700 Redbud Boulevard
           Suite 300
13         McKinney, Texas 75069
           214.544.4000
14         ccrawford@abernathy-law.com

15    FOR THE DEFENDANT BOARD OF TRUSTEES:

16
           Mr. Robert J. Davis
17         MATTHEWS SHIELS KNOTT EDEN & DAVIS & BEANLAND, LLP
           8131 LBJ Freeway
18         Suite 700
           Dallas, Texas 75251
19         972.234.3400
           bdavis@mssattorneys.com

20

21    ALSO PRESENT:
           Ms. Monica Velazquez,
22         General Counsel, Collin College

23         Terry VanDerHeyden - Videographer

24

25
```



```
 1                    H. NEIL MATKIN,
 2   having been first duly sworn, testified as follows:
 3                    EXAMINATION
 4   BY MR. GRUEBEL:
 5        Q.  Good morning, Mr. Matkin.
 6        A.  Good morning.
 7        Q.  We already had these pleasantries off the
 8   record but now we're on the record.  As I have said, my
 9   name is Greg Greubel and I represent Michael Phillips in
10   this case, and I'm going to be asking you some questions
11   about his termination and the events leading up to it.
12                    My colleague here, Josh, has started a
13   timer.  We get seven hours for a deposition.  Just to
14   avoid us all having to do math, we're trying to keep
15   track of it with his timer, but obviously the times that
16   we begin and end will be reflected on the record.  So if
17   there is any dispute about that, we can talk about that
18   if we get close to that seven-hour mark.  I never try to
19   go seven hours but sometimes it is inevitable.
20                    So can you just state your name and address
21   for the record.
22        A.  Harvey Neil Matkin.  My work -- my home
23   address?
24        Q.  Yes.
25        A.  760 County Road 557, Farmersville, Texas 75442.
```



1    Q.   So when did you start at Collin College?

2    A.   I was hired -- started with the 30th

3    anniversary of the college's founding on April 6, 2015.

4    Q.   What does your job as president entail?

5    A.   Wow.  I'm responsible for presenting the master

6    and strategic plans for the board's consideration.  I'm

7    responsible for day-to-day operations of the college and

8    all of the personnel that are hired and retained by the

9    college, interfacing with the community, just a lot of

10   different avenues.

11   Q.   Would you say you have been successful in your

12   position?

13   A.   I believe I have.

14   Q.   How do you measure success?

15   A.   Well, thankfully, I don't get to measure my

16   success but the Board does that annually.  So I get a

17   review, an annual evaluation on an annual basis and one

18   way of measuring it is salary of course.  That's not how

19   I measure it.

20          I ask the question, have we served

21   students.  And if we have served students successfully

22   and if our numbers are shown in a positive way, I feel

23   very good about the work that the college has done.

24          One particular area is that we're always

25   the top first or second college in success measures as



```
 1          Q.   Has that increased since your time at Collin?

 2          A.   Yes, sir.

 3          Q.   Is that the year-over-year increase?

 4          A.   With the exception of some of the COVID-stalled

 5     progress, we saw some slight declines.

 6          Q.   Have you had any issues securing local, state

 7     or federal funding since your time at Collin College?

 8          A.   We have not.

 9          Q.   We can start with some exhibits now.  This will

10     be marked as Matkin 1.

11                    (Exhibit 1 marked.)

12          Q.   (BY MR. GRUEBEL)  Do you recognize this

13     document?

14          A.   I do.

15          Q.   Can you tell me what it is?

16          A.   This looks like a policy, DH, the board

17     policies for the Code of Professional Ethics.

18          Q.   Were you involved in creating this policy?

19          A.   I think the policy already existed when I

20     arrived.  It looks like it's been modified as of

21     7/14/2020.

22          Q.   Were you involved in any of those revisions?

23          A.   I certainly was aware of them but I don't know

24     that I took direct wordsmithing on any of them.

25          Q.   Do you recall what any of the revisions were?
```



1    whatever they want to wherever they want to.  We live in

2    a free county.

3         Q.  Do you make any distinction between privileges

4    and rights?

5         A.  I'm not fond of that but in this case I would

6    use the words interchangeably.

7         Q.  I want to draw your attention -- sorry, before

8    I go there, are there any definitions for what it means

9    to seek revision in a judicious and appropriate manner?

10        A.  I would have to view policy to see, but none

11   come to mind.

12        Q.  What does that mean to you?

13        A.  Well, back on point?

14        Q.  11.

15        A.  11.  It's -- the policy in 11 simply says that

16   the professional educator will observe the stated

17   policies which are passed by the Board, and procedures

18   which are implemented by the college district reserving

19   the right, not giving up their right to seek revision.

20             So seek change where they see change is

21   necessary in a judicious and appropriate manner.

22        Q.  What's the specific goal that the college is

23   trying to achieve with this paragraph?

24        A.  I think it's trying to create an environment

25   where you have to operate according to these policies



1    and these procedures; however, the professional educator

2    has opportunity to suggest or ask for change.  It's

3    really keeping the college fresh and on the forefront.

4         Q.  Does this policy prohibit criticism of the

5    college?

6         A.  I don't think so.

7         Q.  Would you agree that criticism of the college

8    is a viewpoint?

9         A.  Certainly.

10        Q.  Now let's look at paragraph 13.  Tell me when

11   you are ready to talk about it.

12        A.  I'm ready.

13        Q.  What does Academic Freedom mean in this policy?

14        A.  I take it to mean that the individuals

15   responsible for their course content, including the

16   textbook selection that I mentioned earlier and they're

17   not interfered with in the teaching of their particular

18   subject area.

19        Q.  What about the content of their lectures?

20        A.  Again, I think if they're on topic and in the

21   realms of their discipline, I think they've got a lot of

22   freedom, complete freedom.

23        Q.  So in total, how are employees supposed to know

24   what the standards in this Code of Ethics means?

25        A.  How are the employees supposed to know?  We



H. Neil Matkin

February 08, 2023
Page 32

1  have orientation that happens at the beginning of every

2  new employee coming in where they're asked to spend some

3  time with the policies.  I know faculty routinely have

4  workshops at the start of every long semester.  So I

5  would think there would also be some direction from the

6  various associate deans and at the provost on the campus

7  level, at the campus level.

8               (Reporter clarification.)

9       Q.  (BY MR. GRUEBEL)  We have another policy here.

10      A.  What would you like me to do with this?

11              MR. GRUEBEL:  You can ask her.

12              THE COURT REPORTER:  Just start a pile

13  there.

14              (Exhibit 2 marked.)

15      Q.  (BY MR. GRUEBEL)  This is going to be marked as

16  Matkin 2.  Let me know when you are ready to talk about

17  it.

18      A.  I am ready when you are.

19      Q.  Do you recognize the document?

20      A.  I do.

21      Q.  What is it?

22      A.  It's an Employee Standards of Conduct, Policy

23  DH Local.

24      Q.  Who drafts these?

25      A.  Same answer as before.  Would you like me to



H. Neil Matkin

February 08, 2023
Page 33

1    repeat it?

2         Q.  Yes, please.

3         A.  The policies get reviewed once every three

4    years ever since 2015.  They are reviewed in this case

5    by general counsel and we also have a service, the Texas

6    Association of School Boards, that sends us regular

7    updates to policies that have been adopted that reflect

8    legislative changes or other changes in the state.  They

9    also -- we get presented to the Board of Trustees

10   committee, an organization, education and policy

11   committee.  It's a three- or four-board member

12   committee.  It's been both.  There's three now.  It has

13   been four.  And ultimately that policy deliberates or

14   the policy committee deliberates and presents it to the

15   full board for consideration.

16        Q.  And who approves these policies?

17        A.  The board does.

18        Q.  Has this policy that we're looking at here been

19   approved by the board?

20        A.  From what I can see, it looks as if it has.

21        Q.  The bottom left-hand corner says date issued

22   July 14, 2020.  Is that when this policy was put in

23   place?

24        A.  This is when it would have been, I believe,

25   updated.



```
 1                  (Exhibit 5 marked.)
 2        Q.  (BY MR. GRUEBEL)  The next one will be marked
 3   as Matkin 5.
 4        A.  Thank you.
 5        Q.  Let me know when you're ready to talk about it.
 6        A.  I'm ready.
 7        Q.  What is this policy?
 8        A.  This is DGC Local, Employee Rights and
 9   Privileges, Employee Expression and Use of College
10   Facilities.  It's the corollary policy to the legal
11   policy we reviewed before.
12        Q.  Has this policy been approved by the board?
13        A.  It appears so, yes.
14        Q.  Have you ever been involved in revisions to
15   this policy?
16        A.  Only as part of the process that I mentioned
17   earlier.
18        Q.  Do you recall what any of those revisions were?
19        A.  I do not.
20        Q.  What's the purpose of this policy?
21        A.  This policy bears out the commitment to
22   Academic Freedom of educators, dedication to academic
23   responsibility.  And so it's trying to, again, expound
24   upon the earlier ethics policies that we reviewed.
25        Q.  You said it expounds upon the ethics policy.
```



1    public concern?

2         A.   Certainly it was.

3         Q.   Now what's it mean to exercise appropriate

4    restraint?

5         A.   What it means to me is to think about the

6    impact of my words.  I think about my own specific

7    example.

8         Q.   What does it mean for faculty members?

9         A.   I think I would have to have a conversation

10   with the faculty member.  There may be different

11   interpretations.

12        Q.   Why do you think there would be different

13   interpretations of it?

14        A.   What I consider appropriate restraint for me

15   might be -- somebody else would consider something

16   different.

17        Q.   Would you say it's kind of vague?

18        A.   I don't think it's vague for me but I could see

19   that someone else might.

20        Q.   Now what does it mean to exhibit tolerance for

21   differing opinions?

22        A.   That means that we recognize that everybody has

23   their own walk and has their own opinion and we don't

24   condemn or show somebody a lack of respect because their

25   opinion doesn't match ours.



 1  public concern?

 2       A.  Certainly it was.

 3       Q.  Now what's it mean to exercise appropriate

 4  restraint?

 5       A.  What it means to me is to think about the

 6  impact of my words.  I think about my own specific

 7  example.

 8       Q.  What does it mean for faculty members?

 9       A.  I think I would have to have a conversation

10  with the faculty member.  There may be different

11  interpretations.

12       Q.  Why do you think there would be different

13  interpretations of it?

14       A.  What I consider appropriate restraint for me

15  might be -- somebody else would consider something

16  different.

17       Q.  Would you say it's kind of vague?

18       A.  I don't think it's vague for me but I could see

19  that someone else might.

20       Q.  Now what does it mean to exhibit tolerance for

21  differing opinions?

22       A.  That means that we recognize that everybody has

23  their own walk and has their own opinion and we don't

24  condemn or show somebody a lack of respect because their

25  opinion doesn't match ours.



1  policies?

2       A.  The legal policy would have been prior to my

3  hire.  So, no.  The July 11, 2017, policy in the manner

4  described prior.  Would you like me to describe it

5  again?

6       Q.  No.  Do you recall what any of the revisions to

7  the policy were then?

8       A.  I do not.

9       Q.  Now I want to draw your attention to the Core

10 Values.  Now, what are the purpose -- what purpose of

11 the college is furthered by enumerating these Core

12 Values?

13      A.  I think it's a way of communicating of the

14 standards we aspire to.

15      Q.  They say, We have a passion for learning,

16 service and involvement, creativity, academic

17 innovation, academic excellence, dignity and respect and

18 integrity.

19           The Code of Ethics also refers to dignity

20 and respect.  Are those terms defined the same in both

21 policies?

22      A.  I haven't seen definitions for either area but

23 I would assume that they mean the same thing.

24      Q.  Do they mean the same thing to you?

25      A.  They do.



1        Q.  Is it possible for an employee to violate the

2    Code of Ethics' dignity and respect provisions but not

3    violate AD Local's dignity and respect provisions?

4        A.  I would have difficulty imagining that.  So I

5    would say no.

6        Q.  And if an employee violates these Core Values,

7    can they be disciplined?

8        A.  Yes.

9        Q.  What if it's speech on a matter of public

10   concern?

11       A.  I think that's -- we covered that.  I think

12   that's an exception that goes to the rights of the

13   employee individual.

14       Q.  I'll mark this next document Exhibit 7.

15               (Exhibit 7 marked.)

16               MR. GRUEBEL:  Can we go off the record for

17   just a second?

18               THE VIDEOGRAPHER:  We're off the record at

19   11:30 a.m.

20               (Break taken from 11:30 a.m. to 11:31 a.m.)

21               THE VIDEOGRAPHER:  We're back on the record

22   at 11:31 a.m.

23       Q.  (BY MR. GRUEBEL)  Can you tell me what this

24   document is?

25       A.  Let me check all four pages.  This is all CT



```
 1                    MR. GRUEBEL:  Okay.  Good for lunch?

 2                    MR. CRAWFORD:  Yeah.

 3                    THE VIDEOGRAPHER:  We're off the record at

 4    12:06 p.m.

 5                    (Break taken from 12:06 p.m. to 1:09 p.m.)

 6                    THE VIDEOGRAPHER:  And we're back on the

 7    record at 1:09 p.m.

 8                    (Exhibit 13 marked.)

 9         Q.  (BY MR. GRUEBEL)  Here is what's marked as 13.

10                    MR. CRAWFORD:  We're on 13?

11                    MR. GRUEBEL:  Yeah.

12         Q.  (BY MR. GRUEBEL)  Mr. Matkin, during the break

13    did you take any medication or any substance that would

14    impair your ability to give truthful testimony?

15         A.  No, sir.

16         Q.  Can you tell me what I just handed you there as

17    Exhibit 13?

18         A.  You handed me DD Local, policy on board

19    personnel positions.

20         Q.  Do you know if this policy is approved by the

21    board?

22         A.  I believe it was, yes, sir.

23         Q.  Do you know if there have been revisions to

24    this policy?

25         A.  It looks like it was last revised on 1/17/2020
```



H. Neil Matkin

February 08, 2023
Page 87

1    and I don't know what revisions those might have been.

2        Q.  The first paragraph says -- or the first

3    sentence of the first paragraph says, The board

4    delegates to the district president authority to employ

5    administrative personnel, faculty and other full-time

6    personnel for board-approved budgeted positions.

7                Does that mean that you have the final

8    authority to hire and fire faculty members?

9        A.  Yes, sir.

10       Q.  I'll not ask any more questions about that

11   but -- so is posting on social media a part of any

12   Collin College professor's job duties?

13       A.  I'm not sure.

14       Q.  Do you know if it's a standard part of the

15   employment agreement between Collin College and faculty

16   members to post on social media?

17       A.  I do not.

18       Q.  Does the college have any system for tracking

19   social media posts by faculty or staff?

20       A.  Not to my knowledge.

21       Q.  Have you ever heard of social sentinel?

22       A.  I have.

23       Q.  What is that?

24       A.  Social sentinel was either a company or an app,

25   and I don't know which, that was employed as part of the



```
 1        A.   I would have to go back and review the

 2   individual cases.

 3        Q.   You don't have enough information about the

 4   individual cases to give an opinion on that sitting here

 5   today?

 6        A.   I do not.

 7        Q.   Did you ever hear the name Audra Heaslip?

 8        A.   I have.

 9        Q.   Do you recall the decision not to approve her

10   for a contract renewal?

11        A.   I recall the decision being made, yes.

12        Q.   Did you make that decision?

13        A.   I did.

14        Q.   Tell me about it.  What happened?

15        A.   I received a recommendation from the chief

16   operating officer of the college to nonrenew

17   Ms. Heaslip.  I reviewed the circumstance -- I think it

18   was two years ago or thereabouts, either late January or

19   early February of 2021.  I would have reviewed the

20   supporting documentation and made a decision.

21        Q.   Who was the chief operating officer at that

22   time?

23        A.   Dr. Toni Jenkins.

24        Q.   What did Toni Jenkins tell you about Audry

25   Heaslip that lead you to not approve her for a contract
```



H. Neil Matkin

1    renewal?

2         A.  I would have to review the forms that were

3    submitted.  I don't have them committed to memory.

4         Q.  Do you remember anything about it?

5         A.  I remember it was a negative recommendation.

6         Q.  Do you remember if anybody did recommend her

7    for a renewal?

8         A.  I believe that through the process there were

9    earlier "yes" recommendations and I believe Dr. Jenkins

10   recommended "no."

11        Q.  What did you base your decision on?

12        A.  Again, I would need to go back and review the

13   specific documentation.  It's been two years ago.

14        Q.  Do you remember if it was because of something

15   she posted on social media?

16        A.  I don't recall that.

17        Q.  Do you recall if it was something that she said

18   in the public that was critical of the college?

19        A.  I would have to go back and review the

20   documentation.

21        Q.  Do you recall if it involved her advocacy of

22   the Texas Faculty Association?

23        A.  I don't recall that at all.

24        Q.  Are you familiar with the Texas Faculty

25   Association?



H. Neil Matkin                                    February 08, 2023
                                                  Page 103

1         A.  Two of those I have no knowledge of.  I wasn't
2    originally involved in any of them and two of them I've
3    become aware of them as a result of these proceedings or
4    proceedings like this, but I still haven't reviewed the
5    original documentation.  I'll say for your materials, it
6    appears that's the case but I would like to see the
7    original documentation.
8         Q.  You must be from Missouri, the Show Me State.
9         A.  No.  I just don't know what I don't know.
10        Q.  You did approve the decision not to give
11   Dr. Burnett a new contract, didn't you?
12        A.  I did.
13        Q.  You did tell Representative Leach that you'd
14   deal with that when she tweeted something critical of
15   the vice president during the debate, didn't you?
16        A.  I thought I told him I was aware of it and
17   would deal with it, yes.
18        Q.  She ended up being terminated, right?
19        A.  That was the recommendation that was presented
20   to me, yes.
21        Q.  Is that how you dealt with it?
22        A.  That is how I dealt with it.
23             (Exhibit 16 marked.)
24        Q.  (BY MR. GRUEBEL)  This next document is going
25   to be marked as Matkin 16.  Do you recognize that



1    Q.  How about whether it had anything to do with

2  Dr. Jones' criticism of the college's COVID-19 reopening

3  plan?

4    A.  I'm trying to remember if she had specific

5  criticism that was presented to me.  Again, it's been

6  two years ago.

7    Q.  Do you remember if it had anything to do with

8  Dr. Jones not observing the stated policies and

9  procedures of the college and seeking to revise those in

10  a judicious and appropriate manner?

11    A.  I'm sure that factored in but, again, I would

12  like to see the specific materials that I made my

13  decision on.

14    Q.  But why do you think it factored in?  You seem

15  to remember something about that.  Tell me more about

16  it.

17    A.  What's your specific question?

18    Q.  Do you recall if the -- your decision not to

19  give Dr. Jones a new contract had anything to do with

20  her not seeking to revise college policies in a

21  judicious and appropriate manner?

22    A.  My answer to that is, yes.

23    Q.  Tell me why.

24    A.  Why what?

25    Q.  Why -- what did it have -- what did she do to



H. Neil Matkin

February 08, 2023
Page 107

1  not seek to revise those policies in a judicious and

2  appropriate manner from what you recall?

3      A.  If memory serves, I think the day before the

4  spring semester started, Dr. Jones launched a

5  letter-writing campaign to my office after the board had

6  already adopted a go-forth and I think that was part of

7  the discussion.

8            Dr. Jones was a member of the faculty

9  council and had a dozen different remedies available to

10 her for expressing her opinions or affecting change.

11 There was also a task force, a reopening task force that

12 was in place, and I don't think Dr. Jones had a single

13 conversation with any supervisor or anybody up the chain

14 or me before staging an attack on the college.

15     Q.  Now what do you mean by an attack on the

16 college?

17     A.  Dr. Jones solicited a letter-writing campaign

18 to effect opening the college the day before the college

19 opened for the spring.

20     Q.  And you testified earlier that COVID-19 was a

21 matter of public concern, right?

22     A.  It definitely was.

23     Q.  So Dr. Jones was staging a letter-writing

24 campaign about a matter of public concern?

25     A.  No.  Dr. Jones was trying to effect the



1    didn't do.

2         Q.  Do you think she violated the Code of Ethics?

3         A.  I think she could have handled it better.

4         Q.  Do you think she violated the Code of Ethics?

5         A.  She certainly didn't show dignity or respect to

6    her supervisors.

7         Q.  How was she supposed to know that seeking to

8    get public support for a position regarding the

9    college's COVID-19 reopening plan was not dignified or

10   respectful?

11        A.  When you say "public support," do you mean the

12   private group that she campaigned with?  I just want to

13   answer your question accurately.

14        Q.  And I appreciate the clarifying question.  Yes.

15   The 3,000 people in this private Facebook group and

16   anyone else that she went to outside of the college's

17   appropriate channels.

18        A.  I don't know of anyone else other than that

19   group but there may have been some.

20        Q.  Would that have made it a bigger problem if she

21   sought out more than just 3,000 people?

22        A.  I don't think of it in terms of size of

23   problem.  I think of it in terms of appropriateness of

24   action.

25        Q.  And the Code of Ethics requires that



H. Neil Matkin

February 08, 2023
Page 112

1    professional educator observe the stated policies and

2    procedure of the college district reserving the right to

3    seek revision in a judicious and appropriate manner?

4         A.  That's correct.

5         Q.  And she violated that provision?

6         A.  I would think so, yes.  But, again, I would

7    like to see my original -- the packet that I was

8    presented.

9              (Exhibit 17 marked.)

10        Q.  (BY MR. GRUEBEL)  Okay.  Marked as Exhibit 17.

11   Let me know when you have had a chance to take a look at

12   it.  Have you ever seen this before?

13        A.  I'm trying to figure out if I have or not.

14        Q.  Take your time.

15        A.  I don't recognize this document.  I may have

16   seen it but I don't recall it.

17        Q.  That's my only question about it.

18              (Exhibit 18 marked.)

19        Q.  (BY MR. GRUEBEL)  Here's Exhibit 18.  Let me

20   know when you have had a chance...

21        A.  I recall this.

22        Q.  Do you recall receiving it?

23        A.  I do.

24        Q.  Okay.  Do you remember if you did anything in

25   response to receiving that letter?



1   to get to me and it's the main issue -- main thing I get

2   for each individual is a sheet that shows the history of

3   the recommendations through the entire process,

4   including the four levels of administration and Council

5   on Excellence in case of faculty, contractor rules.

6            So those all come as a packet with everyone

7   roughly a third of the multi-year contracts reviewed

8   every year or their extensions.  There's two different

9   categories there.  And then all of the one-years until

10  they achieve a multi-year contract reviewed every year.

11  They come in, yes, large file folders.

12       Q.   Sounds like a big job.

13       A.   I get the smallest part of it but the most

14  important.

15       Q.   Now, we talked about the confederate monument

16  letters that the college got but outside of those, would

17  you say that Michael ever caused a disruption at the

18  college?

19       A.   A disruption?

20       Q.   Yeah.  Or just -- let me start from scratch.

21            Has Michael ever caused a disruption at the

22  college?

23       A.   I'm not aware of a -- disruption is kind of a

24  big word.  I'm not aware of major disruptions that

25  Michael has caused at the college.



1      Q.  Did Michael ever impair the ability of the

2  college to operate and provide education to its

3  students?

4      A.  The college as a whole?

5      Q.  Yeah.

6      A.  No, I wouldn't say that.

7      Q.  Did Michael ever do anything that cost the

8  college money in any form by tax funding or grants from

9  donors or any sort of thing related to the financial

10  well-being of the college?

11      A.  Not to my knowledge.

12      Q.  Who made the final decision not to approve

13  Michael for a new three-year contract?

14      A.  That's my responsibility.

15                    (Exhibit 45 marked.)

16      Q.  (BY MR. GRUEBEL)  Now I'll hand you what's

17  going to be marked as Matkin 45.  Here you go.

18      A.  Thank you.

19      Q.  Do you recognize this?

20      A.  I don't know that I have seen this particular

21  notice but I do recognize what it is, yes.

22      Q.  What is it?

23      A.  This is the chief operating officer of the

24  college, senior vice president Abe Johnson sending out a

25  required notice in a timely manner to individuals who



1    focused on quality of teaching and the public service at

2    the college predominately.  And I don't think those were

3    the areas that rose to the concern among the

4    administration at the various levels.  I think the

5    Council on Excellence, based on the information they

6    reviewed, probably came to the right conclusion.

7         Q.  That Michael's performance as a teacher and

8    public service to the college were not deficient areas

9    for him?

10        A.  That's exactly right.  In fact, he had been

11   allotted as an excellent teacher.

12        Q.  Was it a difficult decision to not renew him

13   for a new three-year contract?

14        A.  It was.

15        Q.  Because he was a great teacher.  What weighed

16   against that, you know, keeping him on for another three

17   years or even another year for that matter?  Was that an

18   option for you to give him a one-year contract?

19        A.  It wasn't what was recommended, but I could

20   have overruled and done that, yes.

21        Q.  What were the mitigating factors against his

22   excellent performance as a professor?

23        A.  I think the thing that -- there were several

24   things that I recall when I was going through the file.

25   The thing that was the hardest for me was the fact that



1  focused on quality of teaching and the public service at

2  the college predominately.  And I don't think those were

3  the areas that rose to the concern among the

4  administration at the various levels.  I think the

5  Council on Excellence, based on the information they

6  reviewed, probably came to the right conclusion.

7      Q.  That Michael's performance as a teacher and

8  public service to the college were not deficient areas

9  for him?

10     A.  That's exactly right.  In fact, he had been

11 allotted as an excellent teacher.

12     Q.  Was it a difficult decision to not renew him

13 for a new three-year contract?

14     A.  It was.

15     Q.  Because he was a great teacher.  What weighed

16 against that, you know, keeping him on for another three

17 years or even another year for that matter?  Was that an

18 option for you to give him a one-year contract?

19     A.  It wasn't what was recommended, but I could

20 have overruled and done that, yes.

21     Q.  What were the mitigating factors against his

22 excellent performance as a professor?

23     A.  I think the thing that -- there were several

24 things that I recall when I was going through the file.

25 The thing that was the hardest for me was the fact that



```
 1   them were consistent, and the students had no reason to
 2   attack Dr. Phillips.  I think something happened and
 3   they were concerned enough to report it.
 4       Q.  Were there any other complaints from students
 5   about Michael from the rest of the semester after he was
 6   given that employee coaching form?
 7       A.  I don't know if there were complaints
 8   afterwards or not.  I know there were some other
 9   concerns that were in my packet relative to Michael
10   sharing a bias and political biases in the classroom as
11   opposed to teaching the broad spectrum of options.
12       Q.  But doesn't Collin College policy permit
13   professors to teach controversial topics?
14       A.  Absolutely.
15       Q.  And he's a historian?
16       A.  He is.
17       Q.  And wouldn't you agree that sometimes
18   historians have to teach difficult subjects that may be
19   interpreted by students in different ways?
20       A.  No arguments.
21       Q.  Now, I want to go back to this document here.
22       A.  This is 48?
23       Q.  Yeah.  Matkin -- you're right, the January 26,
24   2020 memo file.
25       A.  Okay.
```



H. Neil Matkin

February 08, 2023
Page 232

1     Q.  Did you put together memos to file for all of

2  your -- the employees that you decide on whether or not

3  to give them a contract renewal?

4     A.  No, I do not.

5     Q.  Why did you do it for Michael?

6     A.  Michael had already hired an attorney or

7  consulted with an attorney and had already made demands

8  prior to this circumstance.  I anticipated that we would

9  being giving a deposition around this time.  And I

10  wanted to make sure I encompassed my thinking at the

11  time so I wouldn't have to go back and try to piece it

12  together from 50 different documents.

13     Q.  So the third paragraph -- or I'm sorry.

14          The fourth paragraph there, At this

15  juncture of the review process, however, it appears that

16  Dr. Phillips has not met the expectations of his own

17  direct-line supervisors and academic leaders.  Based on

18  the impartial recommendations before me, it appears

19  Dr. Phillips has not worked collaboratively with his

20  associate dean and academic/workforce dean or treated

21  them in a respectful and professional manner.

22          Do you remember what you are referring to

23  there when you are saying that he didn't work

24  collaboratively with the associate dean and

25  academic/workforce dean or treat them in a respectful



```
 1    and professional manner?
 2         A.   I would have to go back and get the packet and
 3    see the specific write-up, but it's many of the areas we
 4    just talked about I'm sure.
 5         Q.   And what are those areas that we just talked
 6    about?
 7         A.   We talked about the disrespect of Dr. O'Quin.
 8         Q.   That's the -- let's look at that document
 9    again.  That's the August 27, 2021, write-up.
10                   What's that marked as?
11                   MR. DAVIS:   41.
12         Q.   (BY MR. GRUEBEL)  So Matkin 41 if you could
13    take a look at that.  Now this document does refer to,
14    We have previously coached Dr. Phillips about using all
15    internal communication channels, for instance, associate
16    dean, dean, Faculty Council with his questions and/or
17    concerns with the college, including formal coaching in
18    July 2019, informal coaching in June 2020, and verbal
19    and email announcements in division meetings in
20    August 2021.
21                   Are those the incidents that you were
22    referencing in the --
23         A.   I believe so, yes.
24         Q.   I'm sorry.  Let me say it clear for the record.
25                   Those were the incidents that you were
```



1   referencing in the January 26, 2022, memorandum?
2        A.   They would have been included in that
3   reference, yes.
4        Q.   Okay.   And you also reference there policy DH
5   Exhibit, and that policy is also referenced in this
6   August 27, 2021, disciplinary form?
7        A.   That's correct.
8        Q.   Are those -- those are the same -- you are
9   quoting the same provisions of the Code of Ethics that
10  he violated; is that right?
11       A.   It says, I worked collaboratively with
12  associate dean and academic or workforce dean.
13       Q.   And Number 4 of the Code of Ethics says, The
14  professional educator shall work to enhance cooperation
15  and collegiality among students, faculty, and other
16  personnel.
17       A.   Yes, sir.
18       Q.   Is that the provision that he has violated?
19       A.   Yes, sir.
20       Q.   Okay.   And then the second one, Number 11, I
21  think you quote that verbatim in your letter, right?
22       A.   Yes, sir.
23       Q.   I'm sorry.   Is that correct that you quote the
24  Code of Ethics, Number 11, in the letter explaining your
25  decision not to renew Michael Phillips for a three-year



1  referencing in the January 26, 2022, memorandum?

2      A.  They would have been included in that

3  reference, yes.

4      Q.  Okay.  And you also reference there policy DH

5  Exhibit, and that policy is also referenced in this

6  August 27, 2021, disciplinary form?

7      A.  That's correct.

8      Q.  Are those -- those are the same -- you are

9  quoting the same provisions of the Code of Ethics that

10  he violated; is that right?

11      A.  It says, I worked collaboratively with

12  associate dean and academic or workforce dean.

13      Q.  And Number 4 of the Code of Ethics says, The

14  professional educator shall work to enhance cooperation

15  and collegiality among students, faculty, and other

16  personnel.

17      A.  Yes, sir.

18      Q.  Is that the provision that he has violated?

19      A.  Yes, sir.

20      Q.  Okay.  And then the second one, Number 11, I

21  think you quote that verbatim in your letter, right?

22      A.  Yes, sir.

23      Q.  I'm sorry.  Is that correct that you quote the

24  Code of Ethics, Number 11, in the letter explaining your

25  decision not to renew Michael Phillips for a three-year



H. Neil Matkin                                    February 08, 2023
                                                  Page 235

1   contract?

2       A.  It is quoted in there, yes.

3       Q.  So it's his violation of that policy a major

4   factor in the decision of yours?

5       A.  One of many factors.

6       Q.  So if Michael would have brought his concerns

7   directly to his frontline supervisors, would he still be

8   employed at Collin College?

9       A.  That's a hypothetical.  I don't know.  Would he

10  also have bullied the students or would that be off the

11  table too?

12      Q.  And when you say "bullied the students," you

13  mean that one disciplinary -- or the one student

14  complaint form, right?

15      A.  The three complaints, the one form and the

16  incident, yes.

17      Q.  So it's three complaints?

18      A.  To my knowledge, yes.

19      Q.  And how do you know it was three complaints?

20      A.  It was reported to me that there were multiple

21  students, one complaint form, I believe one student and

22  a third student and a parent that had complained.

23      Q.  Have you ever had another professor that you

24  considered for a contract renewal that had student

25  complaints?



```
 1   either one year or multi-year.
 2        Q.  And that decision to not renew him was for the
 3   reasons you articulated there in that January 6 --
 4        A.  Yes, sir.  That's correct.
 5        Q.  -- memorandum that's marked as Matkin 1.
 6             THE COURT REPORTER:  Matkin what?
 7             THE WITNESS:  48.
 8             MR. GRUEBEL:  48.  I'm sorry.  Yeah.  The
 9   Bates number is Matkin 1 is what I'm referring to
10   confusingly.
11             (Exhibit 50 marked.)
12        Q.  (BY MR. GRUEBEL)  This is an organizational
13   chart marked as Matkin 50.
14        A.  Thank you.
15        Q.  Is that document accurate with regard to the
16   chain of command for Michael Phillips?
17        A.  I don't think it's accurate for January 2021.
18             (Exhibit 51 marked.)
19        Q.  (BY MR. GRUEBEL)  I'll give you another one
20   then.  That's Matkin 51.  As far as you know, are those
21   the accurate chains of command for the different dates
22   that are listed there?
23        A.  This is accurate to my knowledge.
24        Q.  Matkin 51?
25        A.  Yes, sir.  That's correct.
```



Collin College
043500

EMPLOYEE STANDARDS OF CONDUCT



DH
(LOCAL)

| | |
|---|---|
| **Violations** | Employees will comply with the Code of Ethics set out in DH(EXHIBIT), the standards set out in this policy, and with any other policies, regulations, and guidelines that impose duties or requirements attendant to their status as College District employees. Violation of any policies, core values, regulations, or guidelines may result in disciplinary action, including termination of employment. [See DCC, DIAA, and DM series] |
| **Record Retention** | An employee will comply with the College District's requirements for records retention and destruction to the extent those requirements apply to electronic media. [See CIA and GCB] |
| **Safety Requirements** | All employees will adhere to College District safety procedures and guidelines and will report unsafe conditions or practices to the appropriate supervisor. |
| **Alcohol and Drugs** | A copy of this policy, the purpose of which is to eliminate drug abuse from the workplace, will be provided to all new employees and will be available on the College District human resources' website. |

Employees will not unlawfully manufacture, distribute, dispense, possess, use, or be under the influence of any of the following substances during working hours while on College District property or while engaged in College District-related activities during or outside of usual working hours:

1. Any controlled substance or dangerous drug as defined by law, including but not limited to marijuana, any narcotic drug, hallucinogen, stimulant, depressant, amphetamine, or barbiturate.

2. Alcohol or any alcoholic beverage.

3. Any abusable glue, aerosol paint, or any other chemical substance for inhalation.

4. Any other intoxicant, or mood-changing, mind-altering, or behavior-altering drugs.

5. Any drug paraphernalia used for controlled substances as defined under Health and Safety Code Section 481.002.

An employee need not be legally intoxicated to be considered "under the influence" of a controlled substance.

Exceptions    It will not be considered a violation of this policy if the employee:

1. Uses or possesses a controlled substance or drug authorized by a licensed physician prescribed for the employee's personal use;

DATE ISSUED: 7/14/2020
LDU 2020.03
DH(LOCAL)-X

1 of 6

Collin College
043500

EMPLOYEE STANDARDS OF CONDUCT                                      DH
                                                                 (LOCAL)

2. Possesses a controlled substance or drug that a licensed physician has prescribed for the employee's child or other individual for whom the employee is a legal guardian;

3. Cultivates, possesses, transports, or sells hemp as authorized by law; or

4. Lawfully possesses, sells, or distributes Dextromethorphan.

The District President is authorized by the Board to permit the serving and consumption of alcohol at special fundraising functions for the College District, at specially designated events in College District facilities, and as a part of specifically defined and approved academic curricular programs/classes (e.g., culinary arts).

**Notice**

In addition to a copy of this policy, each employee will be given a copy of the College District's statement regarding a drug-free workplace and drug-free schools and a description of the health risks associated with the use of illicit drugs and the abuse of alcohol.

**Reporting Violations of the Law**

Each employee will report violations of law to his or her supervisor, a human resources representative, the appropriate vice president or provost, or the District President as soon as he or she may become aware of the same. Failure to make such a report and/or failure to report as required by Board policies may compromise the integrity of the College District depending upon the severity of any concealment and may subject the employee to disciplinary action, including termination of employment with the College District.

In instances in which an employee asserts that he or she is being suspended, terminated, or discriminated against on account of the good faith reporting of a violation of law, the employee has all rights and protections afforded by law and in particular under Government Code 554.001, et seq., whereby such action is a form of unlawful retaliation. Employees claiming retaliation under this section will exhaust all administrative remedies to correct an alleged injustice, including filing a resolution of employee concern form [see DGBA(LOCAL)] and following the appropriate procedures thereafter.

**Weapons on Campus**

The College District prohibits the use, possession, or display of any illegal knife, club, or prohibited weapon, in violation of the law or College District policies and procedures, on College District property or at a College District-sponsored or -related activity, unless written authorization is granted in advance by the District President or designee. [See CHF]

**Arrests, Indictments, Convictions, and Other Adjudications**

An employee (or designee, if the employee is incarcerated) will notify his or her immediate supervisor through a written letter via certified (verifiable) email or certified mail and sent/postmarked within

DATE ISSUED: 7/14/2020                                            2 of 6
LDU 2020.03
DH(LOCAL)-X

Collin College
043500

EMPLOYEE STANDARDS OF CONDUCT

DH
(LOCAL)

three calendar days of any arrest, indictment, conviction, no con-test or guilty plea, or other adjudication of the employee for any fel-ony or any offense involving moral turpitude.

**Moral Turpitude**

Moral turpitude includes but is not limited to:

1. Dishonesty, fraud, deceit, theft, or misrepresentation;

2. Deliberate violence;

3. Base, vile, or depraved acts that are intended to arouse or gratify the sexual desire of the actor;

4. Felony possession, transfer, sale, distribution, or conspiracy to possess, transfer, sell, or distribute any controlled sub-stance defined in Chapter 481 of the Health and Safety Code;

5. Acts constituting public intoxication, operating a motor vehicle while under the influence of alcohol, or disorderly conduct, if any two or more acts are committed within any 12-month pe-riod; or

6. Acts constituting abuse under the Texas Family Code.

**Smoke and Tobacco Free Workplace**

The College District prohibits smoking and the use of tobacco products or other electronic smoking devices on all College District property. Violators of this policy may be subject to disciplinary ac-tion, including, but not limited to, termination of employment. [See FLBD]

An employee will not give or sell tobacco products or e-cigarettes to a person in violation of law.

Employees seeking assistance or related educational materials should contact the human resources office.

**Use of College District Equipment at an Off-Campus Location**

College District employees may use College District equipment for College District-related purposes at off-campus locations, including a personal residence, by completing an equipment check-out form and by following the related procedures. Failure to comply with the published guidelines may result in disciplinary action. An employee will not use College District facilities, secretarial assistance, office supplies and equipment, or other College District resources for per-sonal gain or benefit; such use of College District resources for personal gain or benefit is a violation of College District policy and state law.

**Fraternization / Consensual Relationships**

Employees with direct teaching, supervisory, advisory, or evalua-tive responsibility over other employees, students, or student em-ployees are expected to recognize and respect the ethical and pro-fessional boundaries that must exist in such situations. Employees

Collin College
043500

EMPLOYEE STANDARDS OF CONDUCT                                               DH
                                                                        (LOCAL)

must also avoid putting themselves in a compromising position, such as meeting alone with a student in a private residence or non-public place.

While personal relationships between consenting adults are a personal matter, they can create potential conflicts in the workplace and in the educational setting. Such relationships also have the potential for exploitation of an employee, student, or student employee and can possibly create professional or academic disadvantages for third parties.

**Definitions**

Consensual Relationship – a mutually acceptable, dating, romantic, or sexual relationship.

Consensual Relationship in the Workplace – a mutually acceptable, dating, romantic, or sexual relationship between a College District employee (including a student employee) with teaching, supervising, advising, evaluating, or grading authority, and an employee, student, or student employee who is, directly or indirectly, taught, supervised, advised, evaluated, or graded by that College District employee.

Conflict of Interest – Even when there is no actual conflict of interest, a potential conflict of interest or an appearance of impropriety may arise when individuals with the authority and the responsibility to evaluate the work or performance of an employee, student, or student employee initiate, acquiesce to, or engage in an intimate, dating, romantic, or sexual relationship with that employee, student, or student employee.

**Prohibited Conduct**

Employees are prohibited from having a consensual relationship in the workplace that is not reported in accordance with this policy.

This policy applies to all College District faculty, staff, and students. As used in this document, the terms "faculty, staff, and students" include individuals serving as interns or as volunteers, such as volunteer coaches.

**Reporting Responsibility**

When a consensual relationship in the workplace exists, the individual in the position of authority must immediately (and no later than within five days of commencing such a relationship) notify his or her immediate supervisor of the relationship. Failure of the individual in the position of authority to report the consensual relationship in the workplace immediately may result in disciplinary action up to and including termination.

If a conflict of interest or the appearance of a conflict of interest exists as a result of the consensual relationship in the workplace, the individual reporting the relationship will cooperate with his or her supervisor in making all the necessary arrangements to resolve the

Collin College
043500

EMPLOYEE STANDARDS OF CONDUCT                                    DH
                                                            (LOCAL)

conflict of interest. If the conflict of interest cannot be resolved by the supervisor, the supervisor will refer the issue to the Human Resources Department for further resolution, including the removal of the reporting relationship, the reassignment of the reporting employee, other resolution of the conflict of interest, and/or termination of employment. If a consensual relationship in the workplace does not result in a conflict of interest or the conflict of interest is resolved, the relationship will be allowed by the supervisor.

If an allowed consensual relationship in the workplace ends and as a result has a negative impact on either employee's work, it is the employees' responsibility to inform their supervisor(s) and to take appropriate steps to mitigate any conflicts at work. If employees are unable to resolve conflicts at work, the employees will be asked to mutually agree which employee will be reassigned or resign from the College District's employment. If employees are unable to agree on that decision, the College District may elect to terminate the employment of one or both employees at the same time.

| Immediate Supervisor Responsibility | A supervisor who is notified, or becomes aware, of a consensual relationship in the workplace will inform Human Resources. Human Resources will take steps to confirm that the consensual relationship in the workplace exists by meeting with the parties involved and advising that this type of relationship must conform to the guidelines of this policy. Human Resources will work with all parties to alter the conditions that create an actual or potential conflict of interest or the appearance of impropriety caused by the relationship. In most instances, providing alternative arrangements for either party will alter the conditions. In providing alternative arrangements, the College District must ensure no harm comes to the person in the relationship who holds less power or authority. These alternative arrangements must be documented, kept in the employee's personnel file, and reported to the vice president in the reporting line of the employee in the position of authority in the relationship. |

| Procedures for Failure to Cooperate | Employees in positions of authority in consensual relationships in the workplace must fully cooperate in efforts to eliminate any conflict of interest or appearance of impropriety and are subject to disciplinary action up to and including termination for failure to do so. The College District will presume that the relationship was not consensual if the subordinate party complains of sexual harassment related to an undisclosed consensual relationships in the workplace. Allegations of sexual misconduct will be investigated in accordance with College District policy and procedures. |

Collin College
043500

EMPLOYEE STANDARDS OF CONDUCT                                               DH
                                                                       (LOCAL)

Procedure for          An individual who is disciplined under this policy may grieve or ap-
Grievances of          peal through DGBA.
Disciplinary Actions

DATE ISSUED: 7/14/2020                    ADOPTED:                        6 of 6
LDU 2020.03
DH(LOCAL)-X



EMPLOYEE RIGHTS AND PRIVILEGES                                               DGC
EMPLOYEE EXPRESSION AND USE OF COLLEGE FACILITIES                       (LOCAL)

---

*Note:*   For expression and use of College District facilities and distribution of literature by students and registered student organizations, see FLA. For use of the College District's internal mail system, see CHE.

---

**Academic Freedom**

All faculty members (full-time and associate) will be entitled to academic freedom and bear a concomitant dedication to academic responsibility. (The faculty subscribes to the principles expressed in the Statement of Academic Freedom and Responsibility adopted February 19, 1982, by the Texas Junior College Teachers' Association, the text of which is appended to and made an integral part of this document.) [See Statement of Purpose on Academic Freedom and Responsibility, below]

All faculty members enjoy the constitutional freedoms guaranteed to all citizens by the United States' Constitution and the Constitution of the State of Texas. In the classroom, teaching faculty members have the freedom to discuss any controversial matter and to voice opinions within areas of their professional competence. At the same time, they have an obligation to acquaint students with other scholarly opinions on the subject. Outside the classroom, faculty members are free from institutional censorship or discipline for exercising their rights as private citizens to express themselves freely on matters of public concern, to associate with persons or groups as they so choose, and to participate in political or other kinds of activities. When faculty and support staff speak or write as private citizens, however, they must bear in mind that their actions will inevitably be judged by the public and reflect upon their profession and institution. Therefore, faculty and support staff will strive for accuracy, exercise appropriate restraint, exhibit tolerance for differing opinions, and indicate clearly that they are not an official spokesperson for the College District.

The College District accepts the responsibility to foster and to encourage faculty and support staff to exercise their freedoms and to protect against acts that deny freedom of speech and the related freedoms to be heard, to study, to teach, to administer, and to pursue scholarly activity.

Faculty members acknowledge their responsibility to maintain professional competence in their fields of specialization and to be committed to effective teaching and student service.

**Statement of Purpose on Academic Freedom and Responsibility**

The Board believes that it is essential that the faculty have freedom in teaching, research, and publication. Faculty members must be free from the fear that others might threaten their professional careers because of differences of opinion regarding such scholarly

DATE ISSUED: 8/12/2020                                                    1 of 6
LDU 2020.04
DGC(LOCAL)-X

Collin College
043500

matters. To this end, the College District has adopted the following statement of purpose on academic freedom and responsibility.

The College District, like all other institutions of higher education, serves the common good, which depends upon uninhibited search for truth and its open expression. The points enumerated below constitute its position on academic freedom:

1.  Faculty members are appointed to impart to their students and to their communities the truth as they see it in their respective disciplines. The teacher's right to teach preserves the student's right to learn.

2.  The mastery of a subject makes a faculty member a qualified authority in that discipline and competent to choose how to present its information and conclusions to students. The following are among the freedoms and responsibilities that should reside primarily with the faculty, with the advice and consent of the appropriate dean of instruction: planning and revising curricula, selecting textbooks and readings, selecting classroom films and other teaching materials, choosing instructional methodologies, assigning grades, and maintaining classroom discipline.

3.  Faculty members are citizens, and, therefore, possess the rights of citizens to speak freely outside the classroom on matters of public concern and to participate in lawful political activities.

4.  Prior restraint or sanctions will not be imposed upon faculty members in the exercise of their rights as citizens or duties as teachers. Nor will faculty members fear reprisals for exercising their civic rights and academic freedom.

5.  Faculty members have a right to expect the Board and the College District's administrators to uphold vigorously the principles of academic freedom and to protect the faculty from harassment, censorship, or interference from outside groups and individuals.

The academic freedom of the College District faculty members will be accompanied by equally compelling obligations and responsibilities to their profession, their students, the College District, and their community. Faculty members will defend the rights of academic freedom while accepting willingly the responsibilities enumerated below:

1.  Faculty members will be judicious in the introduction of material in the classroom without forfeiting the instructional benefits of controversy.

Collin College
043500

EMPLOYEE RIGHTS AND PRIVILEGES                                    DGC
EMPLOYEE EXPRESSION AND USE OF COLLEGE FACILITIES          (LOCAL)

2. Faculty members are entitled to all rights and privileges of academic freedom in the classroom while discussing the subjects they teach. No faculty member, however, will attempt to force on his or her students a personal viewpoint intolerant of the rights of others to hold or express diverse opinions. Faculty members will not act in a manner that is perceived as being abusive, either physically or verbally, by their students.

3. Faculty members will recognize their responsibility to maintain competence in their disciplines through continued professional development and to demonstrate that competence through consistently adequate preparation and performance.

4. Faculty members will recognize that the public will judge their institution and their profession by their public conduct. Therefore, faculty members will always make clear that the views they express are their own and will avoid creating the impression that they speak or act on behalf of the College District or of their profession.

5. Faculty members will recognize their responsibility to adhere to the policies and procedures of the institution. Therefore, faculty members who have differences of opinion with existing or proposed policies or procedures will express these views through the standing committee structure of the College District or their supervising administrators.

**Expressive Activities by Employees in Common Outdoor Areas**

Common outdoor areas are designated by state law as traditional public forums.

For purposes of this policy, the terms "expressive activities" and "common outdoor areas" are defined in GD(LOCAL).

All College District employees may engage in expressive activities in common outdoor areas, unless:

1. The person's conduct is unlawful;

2. The use would constitute an immediate and actual danger to the peace or security of the College District that available law enforcement officials could not control with reasonable efforts;

3. The use would materially or substantially disrupt or disturb the regular academic program; or

4. The use would result in damage to or defacement of property.

Employees do not need a College District permit or a prior reservation for the exercise of expressive activities in common outdoor areas of the College District. Expressive activity may occur in those

Collin College
043500

EMPLOYEE RIGHTS AND PRIVILEGES                                    DGC
EMPLOYEE EXPRESSION AND USE OF COLLEGE FACILITIES       (LOCAL)

common outdoor areas of the College District that are not in use by others.

However, employees may, and are encouraged to, reserve a space to assemble in the common outdoor areas of the College District. Once a person or group reserves a certain space in a common outdoor area for assembly or expressive activities, it is not available for another person's or group's use or reservation at the same time. Therefore, any person or group using or occupying the space without a reservation must yield control of the space in time to permit any user with a reservation to begin using the space promptly at the beginning of the reserved time.

In addition, when outdoor space is being used, even on a temporary basis, for College District business, operations, events, or an educational function, or a research function, it is not part of the common outdoor area available for use for others' expressive activities.

Reservations for assembly or expressive activities in the common outdoor areas of the College District may be made through the Conference Services Department on a form prescribed by them or through a request sent to reserveCOA@collin.edu. If the expected attendance at an assembly or expressive activity is 15 or more people, advance notice and a reservation of no less than two weeks is recommended. Persons and organizations are encouraged to seek a reservation of a space that is suited to their assembly's anticipated size.

**Time, Place, and Manner Rules for Common Outdoor Areas**

In addition to the specific rules addressed in this policy and in DGD, expressive activities by employees in common outdoor areas are subject to the time, place, and manner rules listed in GD(LOCAL).

**Facilities Use**

Other than the use of common outdoor areas, the facilities of the College District will be made available to employees or employee organizations, when such use does not conflict with use by, or any of the policies and procedures of, the College District. The requesting employees or employee organization will pay all expenses incurred by their use of the facilities in accordance with a fee schedule developed by the District President or designee.

An "employee organization" is an organization composed only of College District faculty and staff or an employee professional organization.

The distribution of materials by employees or employee organizations in College District common outdoor areas is subject to the same policies set out in GD.

Collin College
043500

EMPLOYEE RIGHTS AND PRIVILEGES                                    DGC
EMPLOYEE EXPRESSION AND USE OF COLLEGE FACILITIES                 (LOCAL)

**Requests**                To request permission to meet in College District facilities, inter-
                            ested employees or employee organizations will file a written re-
                            quest with the facilities scheduling coordinator in accordance with
                            administrative procedures.

                            The employees or the employee organization making the request
                            will indicate that they have read and understand the policies and
                            rules governing use of College District facilities and that they will
                            abide by those rules.

                            Employees may, and are encouraged to, reserve a space to as-
                            semble in the common outdoor areas of the College District. Once
                            a person or group reserves a certain space in a common outdoor
                            area for assembly or expressive activities, it is not available for an-
                            other person's or group's use or reservation at the same time.
                            Therefore, any person or group using or occupying the space with-
                            out a reservation must yield control of the space in time to permit
                            any user with a reservation to begin using the space promptly at
                            the beginning of the reserved time. [See GD]

Approval                    Other than the use of common outdoor areas, the Vice Presi-
                            dent/Provost of each campus will approve or reject the request for
                            use of College District facilities in accordance with provisions and
                            deadlines set out in this policy, GF(LOCAL), and administrative
                            procedures, without regard to the religious, political, philosophical,
                            ideological, academic viewpoint, or other content of the speech
                            likely to be associated with the employees' or employee organiza-
                            tion's use of the facility.

                            Approval will not be granted when the official has reasonable
                            grounds to believe that:

                            1.   The College District facility requested is unavailable, inade-
                                 quate, or inappropriate to accommodate the proposed use at
                                 the time requested;

                            2.   The applicant is under a disciplinary penalty or sanction pro-
                                 hibiting the use of the facility;

                            3.   The proposed use includes nonpermissible solicitation;

                            4.   The proposed use would constitute an immediate and actual
                                 danger to the peace or security of the College District that
                                 available law enforcement officials could not control with rea-
                                 sonable efforts;

                            5.   The applicant owes a monetary debt to the College District
                                 and the debt is considered delinquent;

Collin College
043500

EMPLOYEE RIGHTS AND PRIVILEGES                                          DGC
EMPLOYEE EXPRESSION AND USE OF COLLEGE FACILITIES            (LOCAL)

| | |
|---|---|
| | 6.   The proposed activity would disrupt or disturb the regular academic program; |
| | 7.   The proposed use would result in damage to or defacement of property or the applicant has previously damaged College District property; or |
| | 8.   The proposed activity would constitute an unauthorized joint sponsorship with an outside group. |
| | The Vice President/Provost, Director of Auxiliary Services, or a designee will provide the applicant a written statement of the grounds for rejection if a request for use of the facilities is denied. |
| **Announcements and Publicity** | In accordance with administrative procedures, all employees and employee organizations will be given access on the same basis for making announcements and publicizing their meetings and activities. |
| **Identification** | Employees and employee organizations using College District facilities must provide identification when requested to do so by a College District representative or College District police officer. |
| **Violations of Policy** | Failure to comply with this policy and procedures regarding use of College District common outdoor areas, College District facilities, or distribution of literature will result in appropriate administrative action, including but not limited to, the suspension of the individual's or organization's use of College District facilities and/or the confiscation or discarding of nonconforming materials. An employee who fails to comply with or violates this policy may be disciplined under applicable procedures provided by other College District policies and rules, and may be referred to a supervisor, dean, or the Human Resources Department for disciplinary action. Community members or off-campus organizations who violate the rules in this policy may also be subject to criminal trespass charges or other lawful measures. |
| **Interference with Expressive Activities in Common Outdoor Areas** | Employees who interfere with the expressive activities permitted by this policy will be subject to disciplinary action in accordance with the College District's discipline policies and procedures [see DH, FM, and FMA]. |
| **Appeals** | Decisions made by the administration in accordance with this policy may be appealed in accordance with DGBA(LOCAL) or FLD(LOCAL), as applicable. |
| **Publication** | This policy and associated procedures must be posted on the College District's website and distributed to employees in appropriate publications. |

DATE ISSUED: 8/12/2020                ADOPTED:                                6 of 6
LDU 2020.04
DGC(LOCAL)-X

Collin College
043500

PERSONNEL POSITIONS



DD
(LOCAL)

The Board delegates to the District President authority to employ administrative personnel, faculty, and other full-time personnel for Board-approved budgeted positions. A personnel report will be presented to the Board as a part of the consent agenda that provides background information on new full-time employees, promotions, and exits. [See DC(LOCAL)]

The District President or designee will employ part-time personnel based on recommendation of the appropriate administrator and based on need.

The job descriptions and qualifications for all positions will be approved by the human resources office prior to posting a vacant position. Job descriptions will be maintained by the human resources office. Except in cases where unusual circumstances exist, all employees will be classified as one of the following.

**Contract Employment**

An employee in a duly authorized and funded full-time faculty position will be considered a full-time faculty member with a full-time faculty contract.

The District President will be employed with a full-time administrative contract.

**Noncontract Employment**

Staff and Administrative Employees

Full-time employees paid on the staff and administrative salary schedules are considered noncontractual personnel and are hired on an at-will basis. All noncontractual employees are hired based upon need and may be released at any time for any reason or for no reason at the sole discretion of the College District.

Temporary Salaried Employees

Full-time employees hired based on a short-term need are considered temporary full-time employees and may be released at any time for any reason or for no reason at the sole discretion of the College District without the right to appeal.

Temporary Grant-Funded Employees

Full-time employees, employed in positions that are funded by federal or other special funding, have a term of employment equal to the term of the temporary assignment or until the loss of one or more funding sources, whichever occurs first. Such employees may be released at any time for any reason or for no reason at the sole discretion of the College District. The College District may continue to employ an individual after the loss of a funding source at a reduced compensation rate, where the reduction is proportionate to the loss of funding.

Employee with Supplemental Assignments

Supplemental duties may from time to time be assigned to full-time employees. No property right to continued employment exists in such supplemental duties, and such assignments may be terminated for any reason or for no reason, at the sole discretion of the College District.

Collin College
043500

PERSONNEL POSITIONS                                                                    DD
                                                                                  (LOCAL)

| | |
|---|---|
| Noncontract Employees Without Benefits | Noncontract employees whose assigned workload (hours worked per week) and compensation rate do not meet the state's criteria for eligibility for the state-provided benefits package are considered part-time without benefits and may be released at any time for any reason or for no reason at the sole discretion of the College District without the right to appeal. |
| **Definition of Probationary Employee** | The term "probationary employee" will refer to new and rehired, both contract and noncontract full-time employees in the first 90 days of full-time employment with the College District. Employees in a new employee probationary status may be dismissed at any time during the probationary period for any reason or no reason at the sole discretion of the College District and without the right to appeal. |

DATE ISSUED: 1/17/2020                       ADOPTED:                              2 of 2
LDU 2020.02
DD(LOCAL)-X



**MEMORANDUM**

FROM: Dr. Neil Matkin

TO:     Memo to File

DATE:  January 26, 2022

RE:      Dr. Michael Phillips 2022-2025 Faculty Contract - Nonrenewal

As part of our annual faculty contract review process, I received a recommendation form for Dr. Phillips indicating that none of his supervisory levels recommended him for either a faculty contract extension or multi-year faculty contract.

His Associate Dean, who is relatively new to the college, did not recommend him. His Academic/Workforce Dean, a long-time colleague of Dr. Phillips, did not recommend him. The Council on Excellence reviewed his submitted multi-year contract packet and, based on their four assessment areas, recommended him. Afterwards, his Campus Provost, who had previously served as his Dean, nevertheless, also did not recommend him. Finally, the college's Senior Vice President of Campus Operations, who had previously served as his Campus Provost on the Plano Campus, also did not recommend Dr. Phillips.

Most of these individuals are colleagues who have worked directly with Dr. Phillips and have engaged in efforts to help him succeed at the college over many years. Some of these individuals and others have brought Dr. Phillips' workplace concerns forward and we have collectively addressed many of them, at times with meaningful and constructive discussions to find ways to best support the vision and mission of the college. I, myself, have renewed Dr. Phillips' multi-year contracts twice since 2016 without any regard to his social activism and self-serving activities during that time. In fact, he received positive recommendations throughout the last few years and I agreed with his Associate Dean, Dean, and Provost.

At this juncture of the review process, however, it appears that Dr. Phillips has not met the expectations of his own direct line supervisors and academic leaders. Based on the impartial recommendations before me, it appears that Dr. Phillips has not worked collaboratively with his Associate Dean and Academic/Workforce Dean or treated them in a respectful and professional manner. Dr. Phillips has demonstrated to supervisors that he ignores their directives to follow institutional policies and processes and allow those processes to fully work to address his workplace concerns. In not allowing our college supervisors or structures to address concerns, such as poor communication issues that inevitably arise from time to time at an institution of our size, Dr. Phillips has not sought revision of those disagreements or concerns of procedures in a judicious and appropriate manner as expressly required by Board policy DH(LOCAL) and DH(EXHIBIT).

Dr. Phillips has made deliberate choices and conducted himself in ways that benefit primarily his own self-interests and image, at the expense of the vision and mission of the college. I regret that Dr. Phillips' self-serving actions, at times lacking much factual support or scholarly discipline, do not bring credit to the college. The vision and mission of the college are non-negotiables and they must take priority over

those who are clearly self-absorbed or focused on self-constructed holograms that disingenuously project their world view.

Dr. Phillips continuing public protests and interests– and even misinformed personal attacks on me and my former religious affiliations – have absolutely no bearing on my final decision.  Based on the totality of the recommendations before me, I do not approve a multi-year faculty contract or a one-year faculty contract for the 2022-2025 academic years for Dr. Phillips.

MATKIN_000002

COLLIN COLLEGE 002127



Harvey N. Matkin
District President

Abe Johnson
Senior Vice President
Campus Operations

Mary Barnes-Tilley
Campus Provost

Kristen Streater
Dean of Academic
Affairs and Workforce
Programs

Chaelle O'Quin
Associate Dean of
Academic Affairs and
Workforce Programs

Joseph M Phillips
Professor, History

May 2022



DEPOSITION
EXHIBIT
5 /
matfin
PENGAD 800-631-6989

```
 1               THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3    JOSEPH MICHAEL PHILLIPS,       )
                                     )
 4              Plaintiff,           )
                                     ) Civil Action
 5    VS.                            ) No. 4:22-cv-184-ALM
                                     )
 6    COLLIN COUNTY COMMUNITY        )
      COLLEGE DISTRICT, et al.,      )
 7                                   )
                Defendants.          )
 8

 9               REPORTER'S CERTIFICATION
                DEPOSITION OF H. NEIL MATKIN
10                  FEBRUARY 8, 2023

11        I, Christy Cortopassi, Certified Shorthand Reporter

12    in and for the State of Texas, hereby certify to the

13    following:

14        That the witness, H. NEIL MATKIN, was duly sworn by

15    the officer and that the transcript of the oral

16    deposition is a true record of the testimony given by

17    the witness;

18        That the deposition transcript was submitted on

19    _____3-8-23_____ to the witness or to the attorney

20    for the witness for examination, signature and return to

21    me by _____4-7-23_____;

22        That the amount of time used by each party at the

23    deposition is as follows:

24    Mr. Greg H. Greubel.............06:16
      Mr. Charles Joseph Crawford.....00:00
25    Mr. Robert J. Davis.............00:00
```



1       I further certify that pursuant to FRCP No

2    30(f)(1) that the signature of the deponent.

3       __X__ was requested by the deponent or a party

4    before the completion of the deposition and that the

5    signature is to be returned within 30 days from date of

6    receipt of the transcript.  If returned, the attached

7    Changes and Signature Page contains any changes and the

8    reasons therefor;

9       _____ was not requested by the deponent or a party

10   before the completion of the deposition.

11      I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties or

13   attorneys in the action in which this proceeding was

14   taken, and further that I am not financially or

15   otherwise interested in the outcome of the action.

16      Certified to by me this ___8th___ of ___March___,

17   2023.

18

19

20   _____

21   Christy Cortopassi, Texas CSR 6222
     Expiration Date. 10/31/2024

22   Firm Registration No. 633
     Magna Legal Services

23   866.624.6221
     www.MagnaLS.com

24

25



1          I, H. NEIL MATKIN, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5

6

7                                          H. NEIL MATKIN

8

9

10

11    _____ No changes made   ___✓___ Amendment sheet(s) attached

12

13    JOSEPH MICHAEL PHILLIPS

14

15    Vs.

16

17    COLLIN COUNTY COMMUNITY COLLEGE DISTRICT, et al.,

18

19

20    JOB NO.  916091

21

22

23

24

25



H  Neil Matkin

1              CHANGES AND SIGNATURE

2    WITNESS· H. NEIL MATKIN

3    DATE· FEBRUARY 8, 2023

4

5    PAGE LINE      CHANGE            REASON

6  __See attached pages.__ _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



### ERRATA PAGE

| Page | Line(s) | Change(s) | Reason(s) |
|------|---------|-----------|-----------|
| 9 | 2 | "Star" to "Stark" | Correction |
| 9 | 17 | Insert "full-time" after "worked" | Clarification |
| 9 | 19 | "recruiter" to "recruited" | Correction |
| 9 | 20 | "at my home in Amador and Texas" to "at my home in Texas at Ambassador College" | Correction |
| 10 | 21 | "Custer" to "Kustra" | Correction |
| 10 | 22 | "Older" to "Illinois" | Correction |
| 12 | 23 | Insert "it" after "taught" | Complete sentence |
| 14 | 1 | "a number" to "the number" | Correction |
| 14 | 18 | "Austin College" to "Austin Community College" | Correction |
| 14 | 23 | "not probably" to "probably not" | Grammatical correction |
| 16 | 8 | "policy to make sure that every policy got" to "process to make sure that every policy got" | Correction |
| 16 | 8 | "renewed" to "reviewed" | Correction |
| 17 | 8 | "faculty counsel" to "faculty council" | Make universal change to correct name |
| 20 | 2 | "distance" to "disciplines" | Correction |
| 22 | 6 | "rolling" to "rowing" | Correction |
| 22 | 21 | "recognize" to "recognized" | Correction |
| 23 | 6 | "workplace" to "workforce" | Correction |
| 23 | 24 | "measure" to "number" | Correction |
| 24 | 1 | "coaching counseling" to "coaching or counseling" | Correction |
| 26 | 4 | "that we get involved in" to "that would involve" | Correction |
| 28 | 6 | "I understood it" to "I have understood it" | Correction |
| 32 | 6 | "at the provost" and "with the provosts" | Correction |
| 37 | 9 | "how to file and EEOC" to "how to file an EEOC" | Correction |
| 39 | 10 | Delete "we" | Correction |
| 39 | 18 | "or yes" to "so, yes" | Correction |
| 40 | 14 | "that it meets " to "that it meets good cause " | Complete Answer |
| 41 | 14 | "in this case " to "in that case" | Correction |
| 41 | 19 | "came" to "come" | Correction |
| 45 | 16 | "the person's comment" to "the personal comment" | Correction |
| 46 | 19 | "reflect" to "reflects" | Correction |
| 49 | 11-12 | Delete answer Insert, "no " | Misspoke Legal policies are not approved by the Board, as stated earlier, Legal policies are drafted by the Texas Association of School Boards |
| 66 | 21 | "respect" to "respective" | Correction |
| 67 | 7 | "role admissions" to "role and mission" | Correction |
| 67 | 24 | Delete answer Insert "Only the local policy is approved by the Board " | Misspoke Legal policies are not approved by the Board |
| 78 | 12 | "freedom" to "property" | Correction |

| 81 | 14 | "explicit" to "exclusive" | Correction |
|---|---|---|---|
| 83 | 3 | "of" to "or" | Correction |
| 92 | 24 | "Audry" to "Audra" | Correct throughout transcript |
| 94 | 12 | Delete answer  Insert "2021" | Correction  2021 was identified as the year |
| 102 | 19 | " 59" to "Paragraph 59 " | Correction |
| 103 | 22 | "That is how I dealt with it " to "That is how I dealt with that recommendation " | Misspoke  I was referring to the process of receiving a non-renewal recommendation |
| 107 | 6 | "go forth" to "go-forward plan" | Correction |
| 113 | 2 | "AUP" to "AAUP" | Correction |
| 113 | 3 | "Ms  Heaslip put Dr  Jones' file complaints and" to "Ms  Heaslip and Dr  Jones filed complaints and" | Correction |
| 114 | 24 | "personal" to "personnel" | Correction |
| 119 | 17 | "that's off" to "that's fallen off" | Correction |
| 120 | 15 | "pros of tenure you have" to "pros of tenure is that you have" | Correction |
| 122 | 6 | "were" to "was" | Correction |
| 122 | 15 | "advocate" to "advocacy" | Correction |
| 129 | 1 | "colleges" to "college" | Correction |
| 130 | 25 | "personal" to "personnel" | Correction |
| 138 | 18 | "in there" to "on there" | Correction |
| 141 | 2 | "SACSCO" to "SACSCOC" | Correction and make change throughout |
| 142 | 7 | "SACSCO" to "SACSCOC" | Same |
| 144 | 1 | "SACSCO" to "SACSCOC " | Same |
| 147 | 25 | "calls" to "goals" | Correction |
| 148 | 16 | "were" to "was" | Correction |
| 149 | 19 | "they're" to "we're" | Correction |
| 152 | 7 | "faculty staff" to "faculty and staff" | Correction |
| 152 | 9 | "under it" to "under" | Correction |
| 159 | 2 | "peoples" to "people" | Correction |
| 163 | 22 | Delete "so" | Grammatical change |
| 165 | 13 | "reporting" to "requiring" | Correction |
| 165 | 16 | "appreciative" to "they can be appreciated ' | Correction |
| 174 | 16 | "boards that won't go along kind of" to "local boards that won't ago along with this kind of" | Correction |
| 177 | 6 | "trying" to "triune" | Correction |
| 177 | 15 | "elections" to "election" | Correction |
| 180 | 2 | "DISD" to "PISD" | Correction |
| 181 | 13 | "I rarely" to "No, I rarely" | Complete answer |
| 182 | 9 | "pull" to "uphold" | Correction |
| 182 | 10 | "exceed" to "excel ' | Correction |
| 183 | 2 | "comparison" to "comparative" | Correction |
| 183 | 7 | "believe is Buddhist" to "believe in is Buddhism" | Correction |

| 185 | 15-17 | Upon further reflection on this answer, I am not sure it was Mr. Sandford at all | Correction |
|-----|-------|------------------------------------------------------------------------------------|------------|
| 186 | 1 | "the president" to "another president" | Correction |
| 186 | 7 | "anybody" to "nobody" | Correction |
| 188 | 10 | "asks" to "asked" | Correction |
| 192 | 6 | "Crucis" to "Crusius" | Spelling correction |
| 193 | 12 | "Crucis" to "Crusius" | Spelling correction |
| 196 | 22 | "Crucis" to "Crusius" | Spelling correction |
| 205 | 4 | "descriptor" to "descriptors" | Correction |
| 208 | 7 | "recommendations for rules" to "recommendations for non-renewal" | Correction |
| 208 | 9 | "was part of the notes" to "may have been part of the notes" | Complete answer |
| 208 | 19 | "students" to "students'" | Grammar |
| 209 | 14 | "contents" to "content" | Correction |
| 216 | 5 | "faculty, contractor rules" to "faculty contract renewals" | Correction |
| 218 | 7 | "multi-facet" to "multi-faceted" | Correction |
| 218 | 12 | "was" to "were" | Correction |
| 223 | 14 | "Dr. Wise" to "Dr. Weis" | Correction and throughout |
| 223 | 25 | "public" to "college" | Correction |
| 224 | 1 | "public" to "college" | Correction |
| 224 | 11 | "allotted" to "evaluated" | Correction |
| 225 | 3 | "it's done" to "it was done" | Correction |
| 232 | 8 | "we" to "I" | Correction |
| 232 | 9 | "being" to "be" | Correction |
| 241 | 23 | "anywhere" to "in" | Correction |
| 242 | 12 | "for me" to "before me" | Correction |
| 242 | 21 | "that clear" to "that clearly" | Correction |
| 246 | 2-6 | Delete answer. Insert "Nothing, Matkin 50 is accurate." | Dates were checked and organization chart as shown in Matkin 50 is correct |
| 249 | 8 | "Matter fact" to "As a matter of fact" | Correction |

H Neil Matkin

February 08, 2023
Page 2

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        Mr  Greg H. Greubel
          Mr. Joshua T. Bleisch
 5        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
          510 Walnut Street
 6        Suite 1250
          Philadelphia, Pennsylvania 19106
 7        215.717 3473
          greg.greubel@thefire.org
 8        josh.bleisch@thefire org

 9

10   FOR THE DEFENDANT COLLIN COUNTY COMMUNITY COLLEGE
     DISTRICT·

11        Mr. Charles Joseph Crawford
          ABERNATHY ROEDER BOYD & HULLETT, PC
12        1700 Redbud Boulevard
          Suite 300
13        McKinney, Texas 75069
          214.544 4000
14        ccrawford@abernathy-law com

15

16   FOR THE DEFENDANT BOARD OF TRUSTEES:

17        Mr. Robert J. Davis
          MATTHEWS SHIELS KNOTT EDEN & DAVIS & BEANLAND, LLP
18        8131 LBJ Freeway
          Suite 700
19        Dallas, Texas 75251
          972.234 3400
20        bdavis@mssattorneys com

21   ALSO PRESENT:
          Ms  Monica Velazquez,
22        General Counsel, Collin College

23        Terry VanDerHeyden – Videographer

24

25
```





RE: H. Neil Matkin

April 6, 2023

Dear Client:

We are forwarding these documents to you as the custodial attorney in this matter. This transcript is being handled pursuant to the Federal Rules of Civil Procedure and we have copied all parties on the Changes and Signature page(s) with the attached Certificate of Deposition submitted by the deponent to our office.

The items marked refer to the attached documents.

_____✓_____ The Changes and Signature page(s) was returned to our office within the specified time limit; therefore, we are forwarding the original deposition transcript(s) and the Changes and Signature page(s) with the attached Certificate of Deposition to you as the custodial attorney in this matter for safekeeping. All parties will be copied on the Changes and Signature page(s).

_____ The deponent returned the Changes and Signature page(s) within the specified time limit, however, the Changes and Signature page(s) was inadvertently returned without the original transcript. All parties have been copied.

_____ The Changes and Signature page(s) was not returned to our office within the specified time limit; therefore, we are forwarding the original deposition transcript to you as the custodial attorney in this matter.

_____ The Changes and Signature page(s) was returned to our office unexecuted. We are forwarding the original deposition transcript to you as the custodial attorney in this matter.

_____ The deponent returned the Changes and Signature page(s) enclosed after the specified time limit. All parties have been copied as a courtesy.

_____ This is to notify you that the examination and signature was not requested by the deponent and/or a party before the completion of the deposition; therefore, signature is waived pursuant to the Federal Rules of Civil Procedures. All parties have been copied via e-mail.

_____ A copy of the Changes and Signature page(s) was previously returned within the specified time limit. We are now in receipt of the Original Deposition Transcript and/or Changes and Signature page(s); therefore, we are returning it to you as the Custodial attorney in this matter for safekeeping.

_____ Amended.

Should you have any questions or concerns, please feel free to contact our office.

Sincerely,
KTA Certs Department
Certs@KTandA.COM
Nancy Renfroe – Department Manager

Kim Tindall & Associates, LLC
16414 San Pedro Avenue, Suite 900, San Antonio, Texas 78232
Phone: 866.672.7880 Fax: 210.697.3408