# EXHIBIT 4

```
 1              THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3   JOSEPH MICHAEL PHILLIPS,      )
                                   )
 4                Plaintiff,       )
                                   )
 5   VS.                           ) Civil Action
                                   ) No. 4:22-cv-184-ALM
 6   COLLIN COUNTY COMMUNITY       )
     COLLEGE DISTRICT, et al.,     )
 7                                 )
                  Defendants.      )
 8

 9             -----------------------------------

10       ORAL AND VIDEOTAPED REALTIME DEPOSITION OF

11                      H. NEIL MATKIN

12                    FEBRUARY 8, 2023

13             -----------------------------------

14

15

16       ORAL AND VIDEOTAPED REALTIME DEPOSITION OF H. NEIL

17   MATKIN, produced as a witness at the instance of the

18   Plaintiff, and duly sworn, was taken in the above-styled

19   and numbered cause on February 8, 2023, from 9:41 a.m.

20   to 6:21 p.m., before Christy Cortopassi, CSR in and for

21   the State of Texas, reported by machine shorthand, at

22   the law offices of Abernathy Roeder Boyd Hullett, 1700

23   N. Redbud Boulevard, Suite 300, McKinney, Texas 75069,

24   pursuant to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.
```



H. Neil Matkin                                                February 08, 2023
                                                                        Page 6

```
 1                        H. NEIL MATKIN,
 2   having been first duly sworn, testified as follows:
 3                         EXAMINATION
 4   BY MR. GRUEBEL:
 5        Q.   Good morning, Mr. Matkin.
 6        A.   Good morning.
 7        Q.   We already had these pleasantries off the
 8   record but now we're on the record.  As I have said, my
 9   name is Greg Greubel and I represent Michael Phillips in
10   this case, and I'm going to be asking you some questions
11   about his termination and the events leading up to it.
12             My colleague here, Josh, has started a
13   timer.  We get seven hours for a deposition.  Just to
14   avoid us all having to do math, we're trying to keep
15   track of it with his timer, but obviously the times that
16   we begin and end will be reflected on the record.  So if
17   there is any dispute about that, we can talk about that
18   if we get close to that seven-hour mark.  I never try to
19   go seven hours but sometimes it is inevitable.
20             So can you just state your name and address
21   for the record.
22        A.   Harvey Neil Matkin.  My work -- my home
23   address?
24        Q.   Yes.
25        A.   760 County Road 557, Farmersville, Texas 75442.
```



```
 1   incident?
 2        A.   We had a student who was unfortunately involved
 3   in a terrible shooting, a perpetrator, a terrible
 4   shooting in El Paso.  I can't recall now if he was a
 5   current student or a former but he had been a student at
 6   Collin College.  We had received subpoenas from the FBI
 7   and were preparing documents and releasing records under
 8   their guidance.
 9             If I recall, I sent out a directive that
10   asks that law enforcement coordinate through my office
11   or the chief of police's office, who was, in fact, the
12   chief correspondent and chief respondent to the FBI
13   special agent, and I asked everyone else if they were
14   contacted by the press to coordinate through my office
15   or to coordinate through the public relations office, if
16   I recall correctly.
17        Q.   So if you look there at -- it's marked as
18   Collin College 928, the details on this employee
19   coaching form.  It says, Following the El Paso shooting
20   on August 3rd 2019, that paragraph.  There's a quoted
21   portion that it says you sent a directive to college
22   community.
23             Is that an accurate quote from the
24   directive that you sent?
25        A.   Help me get to the exact spot that you are
```



```
 1   contact Michael about a subject of race relations in
 2   regards to the shooting?
 3       A.   I would have to go back and read the article,
 4   see what the article was about, but we were getting
 5   press inquiries around the clock as a result of the
 6   crucis matter and we had a team of reporters show up on
 7   our Frisco campus.  All I was trying to do with my
 8   directive was to make sure that the college's PR and law
 9   enforcement were aware of the media inquiries that we
10   were receiving.
11       Q.   But wouldn't you agree that race relations in
12   the Dallas area is a matter of public concern?
13       A.   Absolutely.
14       Q.   And the Washington Post wanted to speak with
15   Michael about that matter, about race relations?
16            MR. CRAWFORD:  Objection; form.
17       A.   I haven't talked to the Washington Post.  I
18   would be happy to inquire as to why they actually
19   called.  I don't know.  I know what Michael believed and
20   reported and if it is true, then I have no issue.
21       Q.   (BY MR. GRUEBEL)  But no issue in regards to
22   policy DGC Local or no issues in regard to your
23   directive?
24       A.   Well, my directive wasn't followed.  We were
25   contacted by the press, cited as a Collin College member
```



```
 1   and my office and PR was not notified.  I don't know
 2   fully how that came about or if PR notified Kristen that
 3   the article had come out and asked it or what happened
 4   there, but I don't have any knowledge that that ever
 5   happened.
 6        Q.   But did you think that you can issue directives
 7   that place restrictions or restraints on employees'
 8   rights to speak out on matters of public concern?
 9        A.   My directive didn't do that at all.
10        Q.   Can you explain that to me?
11        A.   Sure.  We were being contacted by numerous
12   press outlets every day and the follow-up to the crucis
13   El Paso shooting, I simply asked for the PR department
14   or the chief of police to be notified when we were
15   contacted by the press or law enforcement.  I gave no
16   directive whatsoever regarding Michael speaking to the
17   press as an expert on race.
18        Q.   Then why was he punished for it?
19        A.   He wasn't punished.
20        Q.   He was issued an employee coaching form?
21        A.   He was counseled to follow the directive.
22        Q.   So he violated the directive?
23        A.   That's what I said earlier, yes.
24        Q.   And --
25        A.   It appears to me.
```



MAGNA LEGAL SERVICES

```
 1       Q.  If you look at Collin College 802, it's an
 2   email from Kristin Streater and it says, Going forward,
 3   if any member of the media contacts you about an event
 4   or incident related to the college, you are to direct
 5   them to contact the Collin College public relations
 6   office and the president's office.
 7            Did you read that?
 8       A.  Yes, sir.
 9       Q.  Was that your -- did she write that at your
10   request?
11       A.  No, sir.
12       Q.  Was that how you interpreted the directive that
13   you issued on August 4, 2019?
14       A.  Close.  My intent, again, was to coordinate
15   press contacts and to know who was where doing what with
16   the press relating to this matter since we were under an
17   FBI subpoena.
18       Q.  But doesn't this say that you are to direct
19   them, meaning the press, to contact the Collin College
20   public relations office and president regarding any
21   event or incident related to the college?
22       A.  I don't know what Kristen intended.  I think
23   she was trying to respond to Michael's commentary.  I
24   think she's reiterating the fact that there was a
25   directive that he didn't follow.  I haven't talked to
```



H. Neil Matkin  
February 08, 2023  
Page 196

```
 1  how can the college restrict his ability to speak to the
 2  Washington Post on matters of public concern without
 3  violating his First Amendment right?
 4      A.  I've answered this already.  There wasn't a
 5  restriction for Michael to speak to anybody.  We simply
 6  asked him to notify the appropriate parties of the
 7  college so we knew what was happening.
 8      Q.  Would you have approved his request to speak
 9  with the Washington Post?
10      A.  I don't really care who Michael speaks to.
11  He's spoken to a lot of folks over the last eight years.
12  I have not weighed in on a single one.
13      Q.  Is Michael still employed at Collin College?
14      A.  I don't think so.  In fact, I know he's not.
15      Q.  Is that still the policy at Collin College that
16  if an individual gets contacted about an incident
17  related to the college by the press that they're to
18  alert the president's office before they speak to the
19  press?
20          MR. CRAWFORD:  Objection; form.
21      A.  I don't know that it's in policy and I haven't
22  given additional directives.  The crucis investigation
23  is done so I don't -- it hasn't come back up.  I'm not
24  sure if it's something that's perceived to be a policy.
25  It's not something I've directed.
```



```
 1         Q.   (BY MR. GRUEBEL)  Would you agree that your
 2   directive placed a restraint on Michael's ability to
 3   speak to the press regarding race relations in Dallas as
 4   it related to the El Paso shooting?
 5         A.   No, I don't agree with that.
 6         Q.   Why?
 7         A.   He spoke to them and he didn't get punished.
 8   All he got told to do was please alert and follow the
 9   directive that you were given to make sure that the
10   folks that are coordinating the press coverage of the
11   crucis event at the college are alerted.  He could have
12   easily spoken to anybody he wanted and done a courtesy
13   alert to the PR department and would have been totally
14   fine.
15         Q.   You keep saying that he wasn't punished but he
16   received an employee coaching form.  Can you tell me
17   what distinction you're making there between receiving
18   an employee coaching form and him being disciplined?
19         A.   Certainly.  I'm happy to do that.  A coaching
20   form is an informal conversation that's not recorded in
21   your personnel jacket anywhere.  It doesn't figure into
22   a disciplinary form in any shape or fashion or form
23   unless it's something that's repeated again and then
24   turns into something that becomes a problem.  It doesn't
25   affect his pay.  It doesn't affect his assignments.  It
```



```
 1   to the Washington Post if he would have asked before he
 2   spoke with them?
 3       A.   It's not germane because Michael has no
 4   responsibility to ask me anything or the college
 5   anything about speaking to the Washington Post unless he
 6   wants to use Collin College's name, which wasn't an
 7   issue in this matter.
 8            It looks like to me like he did what he was
 9   supposed to do and told them not to refer to him as
10   anything other than a history professor or a race
11   expert.
12       Q.   But then why did he receive an employee
13   coaching form?
14       A.   Because he didn't notify the folks about the
15   press contact as directed.
16       Q.   So you are saying that he doesn't need to -- he
17   didn't need to seek your approval but he got in trouble
18   because he didn't contact the appropriate folks?
19       A.   We asked all employees to coordinate and let us
20   know what press was asking what while we were
21   cooperating with the FBI on a very highly publicized
22   event that involved one of our students doing atrocious
23   and horrible things and that's truly it.
24       Q.   So is it your testimony that he did not violate
25   your directive?
```



H. Neil Matkin  
February 08, 2023  
Page 201

```
 1      A.  No.  My testimony is, he didn't notify anybody
 2  until we notified him that we had seen the article or
 3  whoever notified him.  It looks like it was Kristen, and
 4  so he did not follow the directive that I issued.
 5      Q.  Is it your testimony that he violated your
 6  directive by speaking with the Washington Post?
 7      A.  No.  My testimony is, he violated my directive
 8  by not alerting us that he spoke to the Washington Post.
 9      Q.  So if he would have done that after the fact,
10  it wouldn't have violated your directive?
11      A.  If he would have notified public relations or
12  the president's office, it would have been in accordance
13  with my specific directive.
14      Q.  Before or after he spoke with them?
15      A.  I don't think it matters.  It's a matter of
16  alerting.  It would have needed to be soon.  We were
17  trying to coordinate with all of the different things
18  that were happening.
19      Q.  How was he supposed to know it didn't matter if
20  he spoke to you before or after he talked to the
21  Washington Post?
22      A.  I don't have a way of answering that.  He
23  didn't seem to know that it was important to talk to me
24  at all.
25      Q.  Go back to Collin College 802 and how Kristen
```



```
 1   Streater interpreted your directive.  She says, Going
 2   forward, if any member of the media contacts you about
 3   an event or incident related to the college, you are to
 4   direct them to contact the Collin College public
 5   relations office and the president's office.
 6              Doesn't that mean you are -- that he was
 7   supposed to refer all media inquiries that he received
 8   to your public relations office or the president's
 9   office?
10       A.  I think, if I may, I think that she's
11   responding to Michael.  Go back to what she originally
12   wrote on the coaching form.  She correctly quoted
13   exactly what I said apparently, Please refer all press
14   reports you may receive to Marcy or by phone to the
15   president's office.
16              Here she's answering Michael's comment.
17   All that Michael would have had to have done in this
18   case from the way I read it is to simply alert folks
19   that he had been contacted.
20       Q.  Did it matter if he did that before or after he
21   spoke with them?
22              MR. CRAWFORD:  Objection; form.
23       A.  As long as he would have notified so that the
24   college would have had an understanding of what was
25   going on around us, I think we would have been fine in
```



```
 1   either case.
 2       Q.  (BY MR. GRUEBEL)  So it didn't matter if it was
 3   before or after?
 4       A.  It wouldn't matter to me.
 5               (Exhibit 40 marked.)
 6       Q.  (BY MR. GRUEBEL)  Let me give you now what's
 7   marked as Matkin 40.  This is a longer one.
 8       A.  You want me to focus on the memorandum?
 9       Q.  Have you ever seen that before?
10       A.  No, sir, I haven't.
11       Q.  Were you aware that Michael Phillips received
12   an informal coaching from Mary Barnes-Tilley in June
13   of 2020?
14       A.  I don't think I was involved in any part of
15   that.
16       Q.  Were you aware of it?
17       A.  No.  Not until just now.
18       Q.  Not until right now sitting here is the first
19   time you heard about it?
20       A.  Yes, sir.
21       Q.  Did you ever talk to Mary Barnes-Tilley about
22   Michael Phillips' Facebook feed?
23       A.  No, I have not.
24       Q.  Did you ever ask Mary Barnes-Tilley to keep
25   track of Michael Phillips' Facebook feed?
```



H. Neil Matkin											February 08, 2023
													Page 256

```
 1                THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                         SHERMAN DIVISION

 3   JOSEPH MICHAEL PHILLIPS,      )
                                   )
 4              Plaintiff,         )
                                   ) Civil Action
 5   VS.                           ) No. 4:22-cv-184-ALM
                                   )
 6   COLLIN COUNTY COMMUNITY       )
     COLLEGE DISTRICT, et al.,     )
 7                                 )
                Defendants.        )
 8

 9                  REPORTER'S CERTIFICATION
                 DEPOSITION OF H. NEIL MATKIN
10                     FEBRUARY 8, 2023

11       I, Christy Cortopassi, Certified Shorthand Reporter

12   in and for the State of Texas, hereby certify to the

13   following:

14       That the witness, H. NEIL MATKIN, was duly sworn by

15   the officer and that the transcript of the oral

16   deposition is a true record of the testimony given by

17   the witness;

18       That the deposition transcript was submitted on

19   _____ to the witness or to the attorney

20   for the witness for examination, signature and return to

21   me by _____;

22       That the amount of time used by each party at the

23   deposition is as follows:

24   Mr. Greg H. Greubel..............06:16
     Mr. Charles Joseph Crawford......00:00
25   Mr. Robert J. Davis..............00:00
```



```
1        I further certify that pursuant to FRCP No.
2   30(f)(i) that the signature of the deponent:
3        __X__ was requested by the deponent or a party
4   before the completion of the deposition and that the
5   signature is to be returned within 30 days from date of
6   receipt of the transcript.  If returned, the attached
7   Changes and Signature Page contains any changes and the
8   reasons therefor;
9        _____ was not requested by the deponent or a party
10  before the completion of the deposition.
11       I further certify that I am neither counsel for,
12  related to, nor employed by any of the parties or
13  attorneys in the action in which this proceeding was
14  taken, and further that I am not financially or
15  otherwise interested in the outcome of the action.
16       Certified to by me this _____of_____,
17  2023.
18
19
20  
    _____
21  Christy Cortopassi, Texas CSR 6222
    Expiration Date: 10/31/2024
22
    Firm Registration No. 633
23  Magna Legal Services
    866.624.6221
24  www.MagnaLS.com
25
```

**MAGNA LEGAL SERVICES**